Re Glycobiosciences, Inc. After the briefs were filed in this case, the Supreme Court decided Teva Pharmaceuticals v. Sandoz. There's a portion of that decision that I believe is extremely relevant to the issues on appeals. And that's the portion of the decision that appears at 135 Supreme Court Reporter, pages 840-841. Even though Teva or Sandoz, as we call it, whichever way you identify it, is a claim construction case, it does indicate that when you are solely reviewing documents, claim construction is purely a matter of law. The reason I think that is important is that here there is no dispute on the facts as to what the prior art document shows. This is not a situation such as Zerko, where you were relying on patent office expertise. This is a situation where we are asking the court to read the document in context. Don't stop short in the middle of a sentence. Don't stop short in the middle of a paragraph. Read the patent in context. And when you do that, you get an entirely different reading compared to the findings from the Patent and Trial and Appeal Board. It is no different, we submit, than if you were to read an encyclopedia and find all of the ingredients. That doesn't teach or motivate or suggest combining the teachings. At best, the components are old, but in a different context, namely with a PGF or a polypeptide growth factor. As a legal matter, that is insufficient and we have identified the Kimberly-Clark case and Gillette case on pages 15 and 16 of our brief for that proposition. Neither of those cases or that concept have been addressed by the director in the opposition brief. Our position is that the primary document was not considered as a whole for everything that it teaches. Rather, there were snippets taken out of context and in our reply brief at pages 7 and 8, we identify proposed findings F2-10, the letter F standing for the Finkenauer patent, in the proper context of what the Finkenauer invention is all about. We also propose... Is it your contention that the claim necessarily excludes PGF? That your claim excludes PGF? It does not exclude PGF. Because it's a comprising claim? Because it's an open-ended claim. Okay. But as we've identified and developed the argument in that context, because the claim was not rejected under 35 U.S.C. 101 or 112 as being incomplete or not enabled, the claim must cover a two-component system. Even though it's open and would cover three, four, or five or many more component systems, it must cover a two-component system, and that is not disclosed in the Finkenauer... I don't understand that argument. Why... It must... Clearly, the claim must include at least a two-component system because you've got non-ionic polymer and HA, so that's two components, but it's a comprising claim. Why can't there be additional components? Well, there can be in an infringing device. The scope of the claim is broader than two components, but the claim must also cover a two-component system. If the scope of the claim is broader than two components, I agree with you. The claim could also cover a two-component system, but we're not talking about infringement. We're talking about obviousness, and when you're talking about anticipation or obviousness, if any point, the claim might cover a two-component system, a three-component system, a four-component system, and if any of those systems are identically disclosed in the prior art, you've got a 102 problem, right? It doesn't have to be all of them, just any of them. Absolutely. And the argument here is that there is Finkenauer, which discloses HA and a non-ionic polymer together. Respectfully, not together. Not together? In two alternate embodiments, and therein is part of the rub, if you will. Okay, what about Finkenauer at about lines of page 4 of Finkenauer, which would be JA381. Let's start around line 40-ish. It's telling you that I'm going to totally garble all of these words, okay? I'm sorry, again, you want to just... I'm going to garble these words. There's no chance I'm going to say these words properly. Page JA381 at line 40. Okay, right around... See where I'm talking about? Yes. Glycosaminogenicans. Not even close, I'm sure of it. This is why I use initials. Yeah, I don't know what the initials are for that thing. The initial for that, by the way, is GAG. GAG. The GAG may be used to enhance wound healing in combination with any other gel-forming polymer. Yes. Right above it said the GA can be selected from a group consisting of HA, right? Yes. That's one of the things. Okay, so we've got HA at this point, and then you go down to the bottom at about page line 55. In a further embodiment, the topical or incisional gel may comprise a cellulose derivative. Preferred cellulose derivatives are HPMC, which I understand is a non-ionic polymer. Yes. Okay, so are you saying that those are totally discrete embodiments, that this embodiment, which can include a non-ionic polymer, doesn't include GE, whatever, whatever, whatever? Yes, Your Honor. That is exactly the position that we are taking, and let me explain the reasons. First of all, in line 55, we have the word comprise, different from consisting of or comprising, but still open-ended. It may comprise a non-ionic polymer, but it's a further embodiment. It's not the same embodiment. But it refers back to any other gel-forming polymer, correct? Absolutely. But the problem is, when you have, under KSR, the teaching, the motivation, the suggestion issue, what is the quantity of polymers? What is the quantity of non-ionic polymers? What is the quantity of regular or ionic polymers, such as HA or all the other GAGs, or PA, which is polyacrylic acid? There are an enormous quantity of possible components to be used. When you then look at the specific examples, examples one through, there's only, I'm sorry, there's six examples in various tables. You don't find two polymers. You certainly don't find an ionic and a non-ionic polymer in any example. Well, but you do have this line that Judge O'Malley honed right in on that says the G thing may be used to enhance wound healing in combination with any other gel-forming polymer, and a non-ionic polymer is another gel-forming polymer, and just a little bit down, it discloses non-ionic polymer. So why isn't that an express disclosure of HA plus a non-ionic polymer? As I said before, Your Honor, we believe that it is insufficient to suggest to one of ordinary skill in the art, what are you combining? HA and a non-ionic polymer? Not necessarily, because at lines 40 and 41, once it says any other gel-forming polymer, that doesn't tell you whether it's going to be part of the GAG family or part of the non-ionic polymer family. They have different purposes, and I would suggest that it's what we would call a gratuitous comment. It's there, but it doesn't teach you anything. See, but this is, your problem is your standard of review. I don't think that you're saying something that had the patent office adopted, I would have said is not supported by substantial evidence. I think that your position, your argument is a reasonable one, but this is a prior art reference, and what it teaches is a question of facts that we review for substantial evidence, and we've got an office action that reviews or decides this issue in a way that is not the way you say, but I'm up against a substantial evidence standard. I'm not doing a de novo thing where I get to say, well, Mr. Snyder's interpretation of this disclosure, you know, actually it resonates with me a little more than the other one. I've got the substantial evidence standard that I'm up against. Well, first of all, under the quotation from Teva that I read, I don't believe you are... You know, just to be clear, you didn't even cite Teva anywhere in your briefs. Well, Teva was decided afterwards. But Teva's a different issue. Teva's talking about, and this has always been a little bit of an oddity in our case as well, but Teva's talking about looking at the patent and the intrinsic evidence relating to what the claims of particular patents mean. What we're talking about here is what a prior art reference teaches, and Teva doesn't overrule our longstanding jurisprudence that says what a prior art teaches, even if it happens to be a patent, is a question of fact. Yes, but in a case this year, INRAE, I'm going to mispronounce this one, IANS, I-M-A-S, 7-8, 5-3, 1250, authored by Judge Moore, you did go back and look at the prior art. Once you disagreed, it happens you disagree with the Patent Office on Claim Construction. But you did go back at the prior art and looked at the prior art, and at page 1254, you reached the conclusion that you did not agree with the Patent Office on the interpretation of the prior art. So, reviewing the prior art is not something that's forbidden, it just has to be substantial evidence. Oh, of course, it just has to be, again, it's not forbidden, but it's still a standard of review. In that case, we concluded that the prior art, that there wasn't substantial evidence supporting the Patent Office's interpretation of that prior art. Yes, that's right. But, so you have to convince us, not just that you have a reasonable position, but that there's no substantial evidence to support the alternative. Now, the other part I would like to address briefly, and I realize I'm going into my rebuttal time, Claim 6, which refers to the use of a drug, the PGF is not a drug. So, the best we can say for the Patent Office's decision is, they found a drug, a specific drug, in another reference, and they say, well, we can substitute that teaching for the non-drug in the primary reference. And again, I would submit that's a pure hindsight, because it ignores the purpose of the PGF, the purpose of the drug. They are different. And you have to be certain that the AHA... So, you're arguing that there's no motivation to combine the use of the drug in Piedmont with the PGF in Finkenau? Combine or substitute? Or substitute for the PGF. Because you have to understand how does the AHA interact, and how does the second ingredient, whether it's a second polymer, ionic or non-ionic, how does that interact? And that was not developed by the Board in its rejection, in its affirmance of the example. Thank you. Thank you, Mr. Snyder. We'll save the remainder of your time for rebuttal. Ms. Lynch? Can we start where he ended? Because I think that's the biggest difficulty I'm having, is that I understand that there are all these pieces and parts, but where does the motivation to combine a drug or to replace PGF with a drug, or the PGF in Finkenau with a drug, come from? I know that you cite Piedmont primarily for that purpose, but what is the motivation to combine those two, or to substitute one for the other? Well, first of all, may it please the Court, first of all, Claim 1 is representative, so there should be no arguments here about Claim 6, because Claim 1 is representative, and glycobiosciences didn't dispute that in their opening brief. But going beyond that, Piedmont actually talks about using HA plus a disinfectant and antibacterials. So also their argument that PGF is not a drug is also a new argument. That was never made before the Board, it was never made in their opening brief. So what the examiner found, though, was that it said Finkenauer didn't disclose an antibacterial, but Piedmont does, and so a person of ordinary skill in the art, looking at these two references, both of which teach that HA is used to treat a dermatological condition, would think to use the antibacterial in Piedmont. So that's where the substitution comes in. But going back to Representative Claim 1, which is really all that's before this Court today, the Board correctly concluded that Representative Claim 1 would have been obvious over three different combinations, Finkenauer and Baldacci, Finkenauer and Galena, Finkenauer and Yamamoto. Each one teaches treating a dermatological condition by topical application of a composition that includes a GAG and HA. And Finkenauer, like we already pointed to, specifically teaches to combine a GAG like HA with another gel-forming polymer, and it tells you why. It says to enhance the wound healing. Now, glycobiosciences argues that the Board erred because we didn't rely on references where HA was the primary ingredient. But, you know, as this Court's already discussed, the claim is broad enough to include an additional non-ionic polymer, and actually glycobiosciences, they sued Nicomed using that exact instruction. Because Nicomed was using a composition that included HA, a non-ionic polymer, and an additional drug. So therefore, it was perfectly proper for the Board to rely on references that included three ingredients. But even if we were to accept glycobiosciences' argument that we had to rely on references that only had two ingredients, the Board did that as well. And if you look at Baldacci, that teaches using a GAG alone, the GAG alone, to treat a dermatologic condition. And it tells you that it's therapeutic. It tells you it restores and heals tissues, and it's an effective agent in the recovery of wounds and lesions. And Galena also teaches that HA on its own is a pharmaceutically active agent, even though it's used with urea. So a person of ordinary skill in the art, considering all of the teachings of the art, not portions of them, as they argue, would have had every reason to combine HA with a non-ionic polymer, either with or without an additional ingredient. And for these reasons, we ask that you affirm. Do you have any questions? No. Thank you, Ms. Lynch. Mr. Schneider, you have some rebuttal time. I return to my opening comments about the scope of the claim, and I believe that because the claim must also be construed as covering two ingredients, notwithstanding that it's an open-ended claim and could include PGF, the interpretation of the primary reference to Pink and Hour is being taken out of context. Now I will say a second thing about Claim 1, and I may have spoken too quickly, Judge O'Malley, in response to your question. I'm not sure that the PGF is a component for therapeutic purposes, which is required by the claim. So I'm not sure Claim 1, even though there's no dispute it's an open-ended claim, I'm not sure the PGF provides that function. You did concede that Claim 1 was representative, though, didn't you? Yes. And so your point is that PGF has no therapeutic properties? I don't believe it has therapeutic properties. It's not disclosed. Let me say it that way. It's not disclosed that it has a therapeutic property encompassed by Claim 1. But if that's the case, then your two ingredients, the HA and the non-ionic polymer, would then be sufficient for purposes of the incisional wound healing? It would be, and that is the comment made, certainly in a footnote in our reply, addressing both Section 101 and Section 112. The claim with just two ingredients must be sufficient, otherwise it would have been rejected under 35 U.S.C. 101 or 112. I'm sorry, that footnote is in our opening brief. But if those two ingredients are sufficient in your claim, and PGF has no therapeutic properties, then why aren't those two ingredients sufficient in Fink and I? The claim is topically applying a therapeutically effective dose of the gelled composition for treating the condition. Now, comprising means there can be other steps as well as saying there can be other ingredients. The claim is open in that regard. It does not tell us that the PGF, or that there could be something else in there that doesn't provide the therapeutic function. The claim is directed to a therapeutically effective dose. Do you want to have a final thought? We're beyond our time. I am beyond. Thank you. Thank both counsel for their argument. The case is taken under submission.